1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JANA SMITH on behalf of minor C.M.,

                          Plaintiff,

        v.

TACOMA SCHOOL DISTRICT,

                          Defendant.

CASE NO. C19-5910 BHS

ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S
MOTIONS

This matter comes before the Court on Defendant Tacoma School District's ("the

District") motion for summary judgment, Dkt. 32, and Plaintiff Jana Smith's ("Smith")

motion to submit SSA Decision, Dkt. 37, and motion to compel interrogatories and

requests for production, Dkt. 40. The Court has considered the pleadings filed in support

of and in opposition to the motions and the remainder of the file and hereby grants the

District's motion and denies Smith's motions for the reasons stated herein.

## I.   PROCEDURAL HISTORY

On September 5, 2019, Smith, on behalf of minor C.M., filed a petition for judicial

review and supporting exhibits in the Pierce County Superior Court for the State of

Washington. Smith seeks review of the Administrative Law Judge's ("ALJ") decision

affirming the District's denial of an Independent Education Evaluation ("IEE") under the
Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq. Id.* Smith is
proceeding pro se. *Id.* On September 29, 2019, the District removed the case to this
Court. Dkt. 1.

On October 9, 2019, Smith filed a motion to seal financial statement, Dkt. 17, and
a motion to allow counseling documents, Dkt. 18. On October 18, 2019, Smith filed a
motion to submit counseling and neurology reports. Dkt. 19. On January 30, 2020, the
Court denied the motions to submit additional evidence as improper attempts to expand
the record as the sole issue on review is the District's January 8, 2019 reevaluation of
C.M. Dkt. 27 at 2.

On March 5, 2020, Smith filed a motion to compel discovery. Dkt. 28. On May 7,
2020, the District filed the instant motion for summary judgment. Dkt. 32.

On May 26, 2020, the Court denied Smith's motion to compel on procedural
grounds and because she failed to establish that additional discovery was necessary or
otherwise relevant to her action for administrative review. Dkt. 35 at 2 (citing *Ojai
Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993)).

On May 12, 2020, Smith filed a declaration in response to the District's motion for
summary judgment. Dkt. 33.[1] On May 17, 2020, Smith filed a brief in response to the

---

[1] The District requests that the Court strike the declaration, arguing that it is inadmissible
additional evidence in this record review appeal and "consists almost entirely of arguments, legal
opinions, personal anecdotes, statements for which Plaintiff lacks personal knowledge, and
statements that are otherwise irrelevant to Plaintiff's appeal." Dkt. 36 at 2. The Court finds that
striking the declaration is unnecessary as the relevant portions of the declaration are duplicated
elsewhere in the pleadings and record.

1   District's motion for summary judgment. Dkt. 34. On May 29, 2020, the District replied.

2   Dkt. 36.

3          On May 30, 2020, Smith filed a motion "for disclosure to submit SSA Decision."

4   Dkt. 37. On June 15, 2020, the District responded. Dkt. 39. On June 16, 2020, Smith filed

5   a motion to compel interrogatories and requests for production. Dkt. 40. On July 6, 2020,

6   the District responded. Dkt. 41.

7          On July 9, 2020, the District filed a motion for extension of time for trial or

8   pretrial dates or to strike trial and pretrial dates. Dkt. 45. On July 27, 2020, the Court

9   granted the motion. Dkt. 52.

10                          **II.   OVERVIEW OF IDEA**

11         "The Individuals with Disabilities Education Act ("IDEA") guarantees children

12  with disabilities a free appropriate public education ("FAPE")." *M.C. by & through M.N.*

13  *v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017), *cert.*

14  *denied sub nom. Antelope Valley Union High Sch. Dist. v. M.C. ex rel. M.N.*, 138 S. Ct.

15  556 (2017) (citing 20 U.S.C. § 1400(d)(1)(A)). Students with qualifying disabilities under

16  the IDEA qualify for special education services if support provided through the regular

17  school program is insufficient. *L.J. by and through Hudson v. Pittsburgh Unified Sch.*

18  *Dist.*, 850 F.3d 996, 1003 (9th Cir. 2017) (citing 20 U.S.C. § 1401(3)(A)). "'[S]pecial

19  classes, separate schooling, or other removal of children with disabilities from the regular

20  educational environment occurs only when the nature or severity of the disability of a

21  child is such that education in regular classes with the use of supplementary aids and

22  services cannot be achieved satisfactorily.'" *Id*. (quoting 20 U.S.C. § 1412(a)(5)(A));

*accord* WAC 392-172A-01035(1)(a) (student eligible for special education is student

with qualifying disability "who, because of the disability and adverse educational impact,

has unique needs that cannot be addressed exclusively through education in general

education classrooms with or without individual accommodations").

IDEA requires that qualifying students are afforded "an educational program

reasonably calculated to enable a child to make progress appropriate in light of the child's

circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct.

988, 1001 (2017). This is achieved "through the development of an individualized

education program ("IEP") for each child with a disability." *Ojai*, 4 F.3d at 1469 (citing

20 U.S.C. § 1401(a)(18)(D)). "The IEP is crafted annually by a team that includes a

representative of the local educational agency, the child's teacher and parents, and, in

appropriate cases, the child."  *Id.* (citing 20 U.S.C. § 1414(a)(5)).

IDEA violations may be procedural or substantive. It is possible for the school

district to deny a FAPE "by failing to comply with the IDEA's extensive and carefully

drafted procedures." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1118

(9th Cir. 2016) (citing *Doug C. v. Haw. Dep't of Educ.*, 720 F.3d 1028, 1043 (9th Cir.

2013)). "While some procedural violations can be harmless, procedural violations that

substantially interfere with the parents' opportunity to participate in the IEP formulation

process, result in the loss of educational opportunity, or actually cause a deprivation of

educational benefits 'clearly result in the denial of a [free appropriate public education.]'"

*Id*. (quoting *Amanda J. ex. rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 892 (9th

Cir. 2001)). A substantive violation occurs when a school district drafts an IEP "that is

not reasonably calculated to enable the child to receive educational benefits." *J.W. v.*

*Fresno Unified Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010).

### III. FACTUAL BACKGROUND[2]

During the relevant time period, C.M., a child, attended an early intervention

preschool program in the District. Smith is C.M.'s grandparent and caregiver. Smith cares

for C.M. and two other grandchildren with special needs. AR 153. C.M.'s uncle, Timothy

Van Cleeve ("Van Cleeve") helps Smith raise C.M. and her siblings and often attended

IEP meetings with Smith. AR 146–47. Michael Beggs ("Beggs"), caregiver for C.M.'s

brother, spent a substantial amount of time in the home and observed C.M. during the

relevant time. AR 602. C.M. has been diagnosed with a number of medical conditions

including sensory processing difficulties, hyperkinesia of childhood with developmental

delay, general anxiety disorder, speech delay, expressive language delay, feeding

difficulties (picky eater, oral aversion), allergies to soy and strawberries, functional

constipation, separation anxiety, and urinary incontinence without sensory awareness. AR

374–75. Outside of school, she receives speech therapy, occupational and feeding

therapy, and counseling, and is followed by an ophthalmologist, pediatric

gastroenterologist, and Developmental Specialist. AR 374. Her pediatrician is Dr.

Michael Tomkins ("Tomkins"). AR 374.

The District evaluated C.M. for special education services in October 2017 just

before her third birthday and found she had a developmental delay. AR 396, 398.

---

[2] Many of the facts in this case are disputed. The Court provides additional detail on the disputed facts in section III.A.2, Analysis.

1　Specifically, the evaluation found that her hyperactivity and impulsivity adversely

2　affected "her ability to attend, socialize, and build satisfactory relationships with peers"

3　and that she needed specially designed instruction ("SDI") "in the area of

4　social/emotional/behavioral skills in order to access the general education curriculum."

5　AR 400.

6　　　　C.M. began attending preschool in Susan Sabol's ("Sabol") classroom beginning

7　in November 2017. AR 155. The District created an IEP for C.M. with two social

8　emotional/behavioral goals to be achieved by November 5, 2018: (1) that C.M. would

9　comply with adult directions and participate in activities without redirection in four of

10　five opportunities as measured by teacher observation and behavioral data and (2) that

11　when she became upset at school, C.M. would name her feelings and choose a calming

12　activity/break in four of five instances as measured by teacher observation and behavioral

13　data. AR 402. C.M.'s IEP provided that she would have breaks available when she was

14　frustrated, short concise directions, positive reinforcement for social skills and choosing

15　calming choices, an area for sensory breaks to calm down and become refocused, and

16　sound filtering headphones as needed. AR 403. She would also have SDI four times per

17　week for thirty minutes. AR 404.

18　　　　A March 2018 IEP progress report stated that (1) C.M. had made good

19　improvement in complying with adult direction and (2) would pout and not engage when

20　she became upset but would not scream or have inappropriate physical contact with

21　peers. AR 394–95. A June 2018 IEP progress report stated that (1) C.M. had met her

22　annual goal regarding participation in adult-directed activities and her retention would be

1    evaluated in the fall and (2) that she was able to name her feelings in three of five

2    instances when she became upset and no longer required calming activities. *Id.*

3          In Fall 2018, C.M. was assigned to Corinne Watson's ("Watson") preschool

4    classroom. AR 157. On October 25, 2018, C.M.'s IEP team met for her annual IEP

5    review. AR 108, 157. Watson reported that C.M. was meeting the goals in her IEP and

6    performing well in classroom assessments. AR 32–33, 108–09.

7          Smith testified that C.M.'s outside speech therapist had suggested that Smith

8    request reevaluation in order to get C.M.'s school-based and outside providers on the

9    same page, AR 159–60, and alleges that she requested a formal reevaluation of C.M.'s

10   eligibility for special education services for this purpose. Dkt. 1-1 at 12. Smith testified

11   that Watson told her to sign a form and "said she didn't have it all there at the moment,

12   but she had me sign one form, which I've not ever seen. And then she requested a

13   reevaluation for me." AR 160. The record includes an October 25, 2018 IEP Review

14   reflecting that Smith was concerned about C.M.'s writing and social interactions. AR

15   351. The team set two new goals for C.M., that by October 25, 2019, she (1) would

16   follow three step directions from adults and (2) would express her own choice when

17   another child invited her to play a game she did not prefer. AR 353. The District also

18   issued a Prior Written Notice on October 25, 2018, notifying Smith that the District

19   proposed changing C.M.'s IEP and noting that Smith requested that the team discuss

20   C.M.'s fine motor skills at its upcoming meeting. AR 359.  On October 29, 2018, the

21   District issued a Notice of Meeting for November 27, 2018, to discuss reevaluation of

22

C.M., Smith's speech/language and occupational therapy concerns, and C.M.'s progress. AR 362.

On November 26, 2018, the school speech-language pathologist observed C.M, finding that both Watson and other students understood C.M. easily when she spoke, and noted that C.M. "inconsistently says t/k at the conversation level" and sometimes made subject pronoun errors but responded to correction. AR 378. The school occupational therapist also screened C.M. for fine motor issues and sensory performance and found "no need for OT fine motor or sensory support for school performance at this time." AR 378–79. School psychologist Dajana Kurbegovic ("Kurbegovic") also formally observed C.M. in the classroom on November 26, 2018 for twenty minutes. AR 375.

On November 27, 2018, Smith met with a team of District employees to consider reevaluating C.M.'s special education eligibility and discuss C.M.'s speech/language and occupational therapy concerns and progress. AR 362. Invitees included the school principal Rebecca Owens ("Owens"), Kurbegovic, the school nurse Maronda Rychtarik ("Rychtarik"), Watson, and the special education instructional facilitator Venessa Christensen ("Christensen"). AR 110, 362. The team discussed Watson and Christensen's belief that C.M. was meeting her IEP goals, that C.M. was doing well on the TS Gold academic and social assessment tool used for all early learning students, and the speech and language pathology and occupational therapy observations and screening results. AR 32, 67. Smith brought counseling, occupational therapy, speech therapy, and developmental specialist records to the meeting and explained that she wanted a reevaluation to get C.M.'s school on the same page with her medical providers and

1   working on the same things. AR 163. She gave these records to Rychtarik at some point

2   in November. AR 164.

3     The team determined that C.M. had "made significant progress in the area of

4   social/emotional/behavioral and may no longer require [SDI]." AR 364. The team

5   planned to reevaluate C.M. and consider "file review, medical/physical, observations, and

6   social/emotional/behavioral." AR 364. Kurbegovic testified that the team decided based

7   on the speech and language and occupational therapy screening results that reevaluation

8   need not include those areas. AR 67–68. The team also agreed to discuss the possibility

9   of a 504 plan for C.M. at the evaluation results meeting. AR 364.[3]

10    Also on November 27, 2018, the District issued a Prior Written Notice of their

11  intent to reevaluate C.M. because she had made significant social/emotional/behavioral

12  progress and may no longer require special education. AR 368. The reevaluation would

13  address the areas of review of existing data, medical-physical, classroom observation, and

14  social/emotional/behavioral. AR 368. Smith signed the form and did not list anything in

15  the "Parental Response" section which provided a space for parents to suggest areas of

16  need for evaluation. AR 369.

17

18

---

19    [3] A 504 plan refers to section 504 of the Rehabilitation Act of 1973, which prohibits
    discrimination based on disability in federally funded programs. A 504 plan encompasses the

20  accommodations, aids, and services a student with "a physical or mental impairment which
    substantially limits one or more major life activities" needs to "access and benefit from their
    education." EQUITY & CIVIL RIGHTS OFFICE, OFFICE OF SUPERINTENDENT OF PUBLIC

21  INSTRUCTION, STUDENTS' RIGHTS, SECTION 504 AND STUDENTS WITH DISABILITIES
    (https://www.k12.wa.us/sites/default/files/public/equity/pubdocs/disabilitysection504_english.pd

22  f) (last visited July 27, 2020).

1      Kurbegovic administered the Behavior Assessment System for Children–3rd

2   Edition ("BASC-3") in November and December 2018. AR 376. The assessment

3   "provides information about observable behaviors in [C.M.'s] multiple settings." *Id*.

4   Kurbegovic collected ratings from Sabol, Watson, and Smith. *Id*. Watson's ratings

5   identified no significant behavioral concerns, though anxiety was just under the "at-risk"

6   range but within normal limits. *Id*. Sabol's ratings identified no significant behavioral

7   concerns, though somatization based on frequent illness and complaints of pain was

8   considered at risk. *Id*. Smith's ratings identified hyperactivity, aggression, attention

9   problems, depression, and withdrawal as behavioral concerns, and atypicality was

10   considered at risk. AR 377. In the "comparison between ratings" section of the

11   evaluation, Kurbegovic noted that "[i]t is not uncommon for guardian and teacher ratings

12   to differ for a multitude of legitimate reasons. Some students try their best at school and

13   struggle outside of the school setting." *Id*.

14      On November 30, 2018, the District issued a Notice of Meeting for December 18,

15   2018 to review evaluation reports and eligibility determination. AR 427. Invited

16   participants included Smith, Owens, Kurbegovic, Rychtarik, Watson, and Christensen.

17   AR 427. Smith testified that the meeting had to be rescheduled due to family illness. AR

18   162. On December 19, 2018, the District issued a Notice of Meeting for a Reevaluation

19   Teem meeting on January 8, 2019, with similar invited participants, though school nurse

20   Sarah Wiseman ("Wiseman") was listed in place of Rychtarik. AR 366. On January 7,

21   2019, Kurbegovic formally observed C.M. in the classroom for fifteen minutes. AR 375.

22

1      At the January 8, 2019 meeting, Kurbegovic presented the Evaluation Summary.

2   The summary contained a review of the evaluations and factors leading to C.M.'s initial

3   qualification for special education services, findings from the BASC-3, information about

4   Kurbegovic's formal classroom observations (and a note that information observations

5   were also conducted), a detailed medical-physical summary prepared by Rychtarik, and

6   assessment summaries from the school speech-language pathologist and the school

7   occupational therapist. AR 370–79. The Eligibility Decision section stated:

8          Teacher ratings and student observations at school indicate appropriate
           social/emotional/behavioral abilities at this time. [C.M.'s]
9          social/emotional/behavioral functioning looks diverse outside the school
           setting, as there are significant concerns per grandparent/guardian report,
10         and [C.M.] is followed medically. However, as there is no adverse impact
           in an educational environment, and [C.M.] no longer requires specially
11         designed instruction (SDI) at school per team decision made on
           01/08/2019, she is being exited from special education.
12
13   AR 370–71. It is undisputed that neither Wiseman nor Rychtarik attended this meeting.

14      On January 14, 2019, Smith requested an IEE for C.M. AR 465. That afternoon,

15   the District issued a Prior Written Notice informing Smith that C.M. would officially be

16   exited from special education services as she "no longer meets eligibility under the

17   developmental delay (DD) category or any other category at this time. There is no

18   educational impact, and specially designed instruction (SDI) is not warranted." AR 451.

19   The notice also stated that C.M. "may benefit from a 504 plan with appropriate

20   accommodations to support her at school. If any significant concerns arise in the future,

21   these can be addressed with the team at that time." *Id*. It also noted that C.M. had access

22   to her water bottle but chose to drink from the water fountain and Dixie cups and that she

1  had "not been observed exhibiting anxious behaviors in the classroom such as chewing

2  on her glasses." *Id*.

3       Smith testified that following the January 8, 2019 meeting, she took the

4  reevaluation report to C.M.'s developmental specialist and to Tompkins. AR 232–33. On

5  January 17, 2019, the developmental specialist gave C.M. a second diagnosis of

6  hyperkinesis and told Smith that as children are not diagnosed with the related condition

7  of ADHD until age five, C.M. would be reviewed for ADHD at the next annual visit. AR

8  233. Smith testified that the developmental specialist did not make a recommendation

9  about how the evaluation or exiting process should have been different because "that's

10  not what she does." AR 233.

11       On January 22, 2019, the District filed a due process hearing request. AR 240. The

12  District asked the ALJ to decide "[w]hether the District's January 8, 2019 reevaluation of

13  [C.M.] was appropriate, and if not, whether [Smith] is entitled to an [IEE] at public

14  expense." AR 241. The ALJ held a telephonic hearing on May 1, 2019. *Id*. Both parties

15  were represented by counsel and submitted post-hearing briefs. *Id*.

16       On June 26, 2019, the ALJ issued her decision. AR 239.

17  **IV.   DISCUSSION**

18       The District moves for summary judgment on all of Smith's claims. Smith (1)

19  seeks reversal of the ALJ's decision and (2) alleges violations of the Health Insurance

20  Portability and Accountability Act of 1996 ("HIPAA"), the Family Educational Rights

21  and Privacy Act ("FERPA"), and 18 U.S.C. § 1505.

22

1     **A.     Review of ALJ Decision**

2          **1.     Standard**

3          "A parent has the right to an [IEE] at public expense if the parent disagrees with

4     an evaluation obtained by the public agency . . . ." 34 C.F.R. § 300.502(b)(1). If a parent

5     requests an IEE at public expense, the agency must either "(i) [f]ile a due process

6     complaint to request a hearing to show that its evaluation is appropriate; or (ii) [e]nsure

7     that an independent educational evaluation is provided at public expense . . . ." 34 C.F.R.

8     § 300.502(b)(2). Additionally, "[a] parent or a school district may file a due process

9     hearing request on any of the matters relating to the identification, evaluation or

10    educational placement, or the provision of FAPE to a student." WAC 392-172A-05080.

11         "Section 1415(l) [of the IDEA] requires that a plaintiff exhaust the IDEA's

12    procedures before filing an action . . . when . . . her suit 'seek[s] relief that is also

13    available' under the IDEA." *Fry v. Napoleon Cmty. Sch.*, 127 S. Ct. 743, 752 (2017).

14    "The IDEA's exhaustion requirement recognized the traditionally strong state and local

15    interest in education, allows for the exercise of discretion and educational expertise by

16    state agencies, affords full exploration of technical educational issues, furthers

17    development of a factual record and promotes judicial efficiency by giving state and local

18    agencies the first opportunity to correct shortcomings." *Kutasi v. Las Virgenes Unified*

19    *Sch. Dist.*, 494 F.3d 1162, 1167 (9th Cir. 2007) (citation omitted). Following an

20    administrative due process hearing, the decision may be appealed to a state court of

21    competent jurisdiction or a district court of the United States. 20 U.S.C. § 1415(i)(2)(A).

22

"Judicial review in IDEA cases 'differs substantially from judicial review of other agency actions, in which courts are generally confined to the administrative record and are held to a highly deferential standard of review.'" *M.C. by & through M.N.*, 858 F.3d at 1194 (quoting *Ojai*, 4 F.3d at 1471). Some deference is afforded to the ALJ's factual findings, "but only when they are 'thorough and careful.'" *Id.* (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)). The "'extent of deference to be given'" is within the reviewing court's discretion. *Id.* (quoting *Union Sch. Dist.*, 15 F.3d at 1524). An ALJ opinion is not thorough and careful, even after a lengthy hearing where the ALJ was actively involved, where it fails to address all issues and disregards evidence presented at the hearing. *Id.* at 1195. However, courts must "refrain from substituting [their] own notions of educational policy for those of the school authority [they] review[]." *L.J. by and through Hudson*, 850 F.3d at 1004–03 (citation omitted).

"In an action challenging an administrative decision, the IDEA provides that 'the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.'" *Ojai*, 4 F. 3d at 1471 (quoting 20 U.S.C. § 1415(e)(2)). Appropriate reasons for expanding the record beyond that considered in the administrative proceeding

> might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing. The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding.

*Id.* at 1473 (quoting *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 790–91 (1st Cir. 1984) (footnotes omitted)). Under the preponderance of the evidence standard, "'complete de novo review of the administrative proceeding is inappropriate.'" *J.W.*, 626 F.3d at 438 (quoting *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007)). The party challenging the ALJ decision bears the burden to show the ALJ's decision should be reversed. *Id.* (citation omitted).

The Court notes that the allegations in Smith's complaint are dense and intertwined. To the extent the Court does not address a specific issue alleged, the Court has been unable to identify how the allegation would provide a basis to overturn the ALJ's decision. *See id.*

### 2.   Analysis

#### a.   Exhaustion

As a threshold matter, the question before the ALJ was whether the District's January 8, 2019 reevaluation of C.M. was appropriate, and if not, whether Smith was entitled to an IEE at public expense. AR 15–16, 241. Thus, the District argues that any challenge to the conclusions drawn from its evaluation (like the decision to cease special education services) rather than the procedure of the evaluation itself are unexhausted and not properly before the Court. Dkt. 32 at 27–28. Specifically, the District identifies as unexhausted Smith's allegations that it deprived C.M. of special education support, denied her a FAPE, left her as a general education student with no accommodations, and improperly exited her off her IEP. Dkt. 32 at 27 & n.5 (citing Dkt. 1-1 at 3, 10, 11, 13). The District cites a number of district court decisions outside the Ninth Circuit for the

1    proposition that the evaluation procedure and the resulting eligibility decision are

2    separate issues for the purposes of exhaustion. *Id.* at 28 (citing, *inter alia*, *E.P. by &*

3    *through J.P. v. Howard Cty. Pub. Sch. Sys.*, No. CV ELJ-15-3725, 2017 WL 3608180 (D.

4    Md. Aug 21, 2017)).

5          Considering Smith's petition, her declaration, and her response brief, Dkts. 1-1,

6    33, 34, the cited allegations could be read to support Smith's argument before the ALJ

7    that the District's handling of the evaluation and its results were improper because the

8    results of the District's evaluation are inconsistent with Smith's observations and C.M.'s

9    medical diagnosis and in connection with her argument before this Court that without an

10   IEE, the problems caused by these errors will continue. *See, e.g.*, Dkt. 34 at 11 ("Plaintiff

11   requests that the Court deny the District's motion, reverse the ALJ decision in all

12   respects, award Plainitff[] prior attorney fees and order the District to pay for C.M. to

13   attend an Independent Education Evaluation at Plaintiff's choice of the Evaluator in order

14   for C.M. to be properly placed into Kindergarten in September of 2020."). Considering

15   the allegations in the context of this relief, the ALJ considered the relevant issues.

16         However, Smith also requests relief in the form of "[a]n order for the District to

17   allow the Student to transfer to a Peer Inclusion Developmental Preschool that employs a

18   certified, qualified and experienced Peer Inclusion Developmental Preschool Specialist

19   Instructor and allows [C.M.] to continue riding on a special education bus." Dkt. 1-1 at

20   16. The issue of whether C.M.'s educational placement was appropriate was not before

21   the ALJ and represents relief available under the IDEA. *Paul G. by and through Steve G.*

22   *v. Monterey Peninsula Unified Sch. Dist.*, 933 F.3d 1096, 1100 (9th Cir. 2019) (citing

*Fry*, 127 S. Ct. at 758) (exhaustion required when gravamen of the complaint is denial of FAPE)); WAC 392-172A-05080. Therefore, the Court agrees with the District that Smith's claims related to the denial of a FAPE are unexhausted and should be raised under the state hearing procedures in the first instance to permit "the exercise of discretion and educational expertise by state agencies" and "afford[] full exploration of technical educational issues." *Kutasi*, 494 F.3d at 1167. Relatedly, Smith alleges that the District violated C.M.'s Fifth and Fourteenth Amendment rights by depriving her of special education support and required accommodations. Dkt. 1-1 at 2, 3. Fifth Amendment procedural due process claims can only be brought against a federal defendant, and the federal government is not a defendant here. *Santa Ana Police Officers Assn. v. City of Santa Ana*, 723 F. App'x 399, 402 (9th Cir. 2018). Fourteenth Amendment claims must be exhausted to the extent they seek relief available under the IDEA. *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 877 (9th Cir. 2011), *overuled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014). As Smith does not indicate how her Fourteenth Amendment claim differs from her IDEA claims, this claim is either unexhausted or fails for the reasons that her IDEA claims fail.

Regarding Smith's allegation that the District improperly exited C.M. from her IEP, the ALJ considered Smith's procedural claims and reached legal conclusions on this issue. *See* AR 252 (concluding the IDEA does not require the District to wait for a health care provider's second opinion before making an eligibility determination). Therefore, the Court finds that to the extent these claims refer to issues decided by the ALJ, the agency has had the opportunity to rule on these claims before they were presented to the

1    Court and they are appropriately exhausted. *Paul G. by and through Steve G.*, 933 F.3d at

2    1102 (a principal purpose of exhaustion requirement is agency opportunity to rule on

3    claims in the first instance).

4         Smith raises a variety of objections to the way the evaluation proceeded and to the

5    ALJ's conclusions about the evaluation. These objections include which party requested

6    the evaluation, whether the evaluation used a sufficient variety of metrics and considered

7    how C.M.'s diagnoses, particularly her sensory disorder, anxiety, and hyperkinesis,

8    affected her ability to learn, whether the school nurse was required to attend the

9    evaluation meeting, and whether the District violated an obligation to inform Smith about

10   her right to an IEE. Smith also alleges that Kurbegovic manipulated documents and thus

11   interfered with the evaluation process.

12                      **b.      Evaluation Request**

13        The parties dispute whether Smith or the District proposed reevaluating C.M.'s

14   eligibility for special education services. Smith argues that she requested C.M. be

15   reevaluated on October 25, 2018 to ensure C.M.'s medical diagnoses were adequately

16   addressed by the District, argues that the District's witnesses lied under oath when they

17   testified that they proposed the reevaluation, and argues that the ALJ erred in concluding

18   otherwise. Dkt. 34 at 2–3, 6. Smith alleges that her request for reevaluation is missing

19   from the record because the District failed to upload it to the relevant public records file.

20   Dkt. 1-1 at 7. Smith specifically objects to the ALJ's factual finding that the District

21   proposed reviewing C.M.'s IEP goals because she was doing so well, *id.* at 6 (citing AR

22   242), and the ALJ's factual finding that the November 27, 2018 meeting was to discuss

1   the District's proposed reevaluation of C.M. rather than Smith's concerns about C.M., *id.*

2   at 6–7 (citing AR 243). Relatedly, she argues the District's proposal to reevaluate C.M.

3   was inappropriate because the District incorrectly concluded that C.M. had met her new

4   IEP goal of following three-step directions. Dkt. 34 at 4.

5       Regarding which party proposed reevaluation, Smith appears to argue that if she

6   proposed the reevaluation, it necessarily would have excluded the District's proposed

7   areas of reevaluation. However, Smith does not cite and the Court has not identified any

8   prohibition against consolidating areas of reevaluation the District believes are warranted

9   with areas the guardian believes are warranted. The November 27, 2018 Reevaluation

10  Notice/Consent form indicated that the reevaluation would address C.M.'s medical-

11  physical concerns among other areas. AR 368–69. Additionally, the form includes a

12  space for the parent to "suggest the following areas of need be considered in assessing

13  my child," but Smith did not complete this section. AR 369. Therefore, Smith fails to

14  establish that the areas identified for reevaluation excluded her request to consider how

15  C.M.'s outside services aligned with her in-school services or otherwise constitute a

16  procedural violation of the IDEA or basis to reverse the ALJ's decision.

17      Regarding whether C.M. was meeting the new IEP three-step direction goal, Smith

18  does not identify evidence in the record before the ALJ that undermines the ALJ's factual

19  finding that when Watson and Christensen implemented the October 25, 2018 IEP goals,

20  C.M. "performed well and achieved the new goals quickly." AR 243. Christensen

21  testified that she agreed with the decision to reevaluate C.M. because based on a number

22  of factors including that C.M. "was meeting the social/emotional component that [she]

had qualified for" as determined by her IEP goals. AR 35. Watson testified that after the IEP team set new goals at the October meeting, C.M. performed "really well" and "achieved all of these goals just quickly." AR 109. Kurbegovic testified that Watson and Christensen both told her that C.M. was able to follow directions well and it was difficult to identify new goals for her because she was doing so well in the classroom. AR 84. Further, Smith does not identify a procedural prohibition against early reevaluation if a child is still working on goals in an IEP. Therefore, Smith has failed to meet her burden to establish by a preponderance of the evidence that the ALJ erred in this finding. Smith's arguments about C.M.'s specific medical conditions are addressed in the next section.

### c.   Evaluation Mechanisms and Medical Diagnoses

Smith makes three sets of arguments regarding the evaluation: (1) the District used insufficient tools to conduct the evaluation, (2) the District improperly closed the evaluation process, and (3) the evaluation inadequately considered C.M.'s medical diagnoses.

Under WAC 392-172A-03020, evaluations must use "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information provided by the parent." Evaluations may not "use any single measure or assessment as the sole criterion" to determine a student's eligibility for special education. WAC 392-172A-03020(2)(b). Reevaluations "must review 'existing evaluation data' on the student and, on the basis of that review and input from the parents, 'identify what additional data, if any,' are needed to ensure the child receives a FAPE." *L.C. on behalf of A.S. v. Issaquah Sch. Dist.*, No. C17-1365 JLR, 2019

1  WL 2023567, at *18 (W.D. Wash. May 8, 2019) (quoting WAC 392-172A-03025(2)),

2  *appeal filed sub nom. Layna Crofts v. Issaquah Sch. Dist.,* 19-35473 (9th Cir.).

3       The ALJ concluded that the evaluation "used a variety of assessment tools and

4  strategies including observation, meeting with the Parent, reviewing medical/physical and

5  other health information, discussing TS Gold data, and performing the BASC-3

6  assessment, to gather relevant functional, developmental, and academic information

7  about the student in the areas of suspected disability." AR 252–53. The ALJ also

8  explained that though Smith argued that the BASC-3 was "not a valid and reliable

9  assessment of [C.M.'s] social emotional/behavioral performance," as Smith did not have

10  training or expertise in special education, her opinion "amounts to a reflection of her

11  disagreement with the Reevaluation Team's conclusions and the results of the BASC-[3]

12  assessment." AR 253.

13       Smith now argues that "[t]wo observations for 20 and 15 minutes by

14  [Kurbegovic] in the classroom and a BASC-3 is not enough to assess C.M. in all her

15  disabilities for her behavioral/emotional/social levels." Dkt. 34 at 6. She alleges that the

16  District failed to administer a variety of assessment tools and should have administered

17  the same range of screenings used to qualify C.M. for special education. Dkt. 1-1 at 4, 12.

18  She also argues that the team did not review and discuss all existing data as part of the

19  evaluation as required by WAC 392-172A-03025. Dkt. 34 at 9 (citing AR 248).

20       Smith fails to cite any record evidence in support of her argument that the team

21  did not review existing data or authority for the proposition that a reevaluation must

22  include the same assessments used in evaluating a child for special education, so the

1    Court finds these objections unfounded. Further, Smith fails to provide, and the Court is

2    unaware of, authority for the proposition that the ALJ made a legal error in concluding

3    that the BASC-3, classroom observation, parent input, classroom academic and social

4    performance data in the form of the TS-Gold assessment, and review of medical provider

5    records together constitute a sufficient variety of assessment tools and strategies for the

6    purposes of the reevaluation at issue. *See Robert B. ex rel. Bruce B. v. W. Chester Area*

7    *Sch. Dist.*, No. Civ. A. 04-CV-2069, 2005 WL 2396968, at *6 (E.D. Penn. Sept. 27,

8    2005) (upholding administrative conclusion that "reevaluations may be properly limited

9    under the statute to a review of records, observations, curriculum-based measures and

10   other non-standardized assessments when the child's broad needs have already been

11   established and when there is no evidence that the child's needs have changed

12   substantially.").

13       Relatedly, Smith alleges that the District failed to issue a Prior Written Notice for

14   a change in assessment tools to the TS-Gold. Dkt. 1-1 at 6. Regarding this tool, Watson

15   and Christensen testified that it is used to continually assess all early learning students in

16   their classroom social and academic performance, rather than serving as a tool to assess

17   children for special education eligibility. AR 32, 35, 114–15. Therefore, it appears that

18   the TS-Gold tool was not a change in evaluation for which the District must issue a Prior

19   Written Notice, WAC 392-172A-05010, but rather a source of data relevant to

20   determining the "present levels of academic achievement and related developmental

21   needs of the student," WAC 392-172A-03025, as part of a reevaluation. Even if a

22   procedural error occurred, Smith does not explain how her ability to meaningfully

1  participate in the special education process was impacted by the lack of notice and thus

2  does not meet her burden to show harm. *Timothy O.*, 822 F.3d at 1118.

3        Regarding the alleged improper closure of the evaluation process, Smith argues

4  that at the January 8, 2019 Evaluation Summary meeting, Kurbegovic and Owens stated

5  that another meeting would follow. Dkt. 34 at 3, 7, 10. Relatedly, she argues that it was

6  improper for the District to exit C.M. off her IEP in the afternoon of January 14, 2019

7  after having received Smith's request for an IEE that morning. *Id*. at 3.

8        The District is correct that Smith does not explain how these issues constitute

9  procedural or other violations of the IDEA. Smith argues that the District knew she

10  wanted to get input from C.M.'s medical providers. Dkt. 34 at 11. The record supports

11  the ALJ's factual conclusion that Smith presented the Evaluation Summary to medical

12  providers after the January 8, 2019 meeting, but the providers did not dispute the

13  evaluation's results. AR 247. The ALJ considered Smith's assertion that she signed the

14  reevaluation report but "did not assent to its validity and wanted time to discuss the

15  results with [C.M.'s] health care providers." AR 252. The ALJ made a legal conclusion

16  that nothing renders a reevaluation inappropriate because the parent does not agree with it

17  and that there is no requirement for the District to accommodate the parent's desire to

18  seek a health care provider's second opinion "before issuing a prior written notice or

19  making an eligibility determination." *Id*. Even so, "the District provided [Smith] with that

20  opportunity after the January 8, 2019 meeting and only issued the PWN when [Smith]

21  made a request for an IEE on January 14, 2019." *Id*.

22

1    Similarly, on the pleadings before the Court, the Court is unable to identify a

2    procedural violation or other basis to conclude the ALJ erred. Smith's objections may

3    also relate to her concerns about the presence of her signature in the documents attached

4    to the January 14, 2019 Prior Written Notice; these issues are addressed in section

5    III.A.2.f, *infra*.

6    Regarding C.M.'s areas of disability and medical diagnoses, Smith alleges that the

7    ALJ erred in finding Smith did not express concerns about C.M.'s cognitive skills,

8    medical diagnoses, communication, anxiety, or fine motor skills, in relation to her

9    allegations that the District did not conduct a sufficiently comprehensive evaluation

10   under WAC 392-172A-0320. Dkt. 1-1 at 12. She argues that the District's team did not

11   listen to Smith or to C.M.'s outside providers and that the ALJ erred when she found

12   otherwise. Dkt. 34 at 6. Smith highlights C.M.'s hyperkinesis, communication and fine

13   motor skills, sensory issues, anxiety, and toileting issues (urinary incontinence and

14   constipation) in her pleadings.

15   Regarding cognitive function, the Court agrees with the District that the ALJ's

16   finding that it was appropriate for the reevaluation not to include cognitive function is

17   supported by the record and applicable regulations. *See* Dkt. 32 at 18-19 (citing AR 83,

18   91, 155, 253). Smith does not identify evidence to the contrary.

19   Regarding hyperkinesis, Smith argues that the District should have concluded that

20   C.M.'s hyperkinesis (a diagnosis related to ADHD that applies to children under five)

21   impacted her education because C.M. could not learn to write her name. Dkt. 34 at 4–5.

22   The ALJ did not address this issue. Smith testified at the hearing that C.M. could not

1    spell her name and was assigned homework regarding writing her name for two and a

2    half months. AR 167. Smith also submitted a declaration from Beggs at the hearing,

3    which stated that C.M. could spell her name but could not write it without tracing. AR

4    602. Watson testified that C.M. could write her name, AR 141, though it is unclear

5    whether this testimony refers to spelling or was limited to C.M.'s ability to properly write

6    each letter of her name. Smith fails to cite evidence that she requested C.M. be evaluated

7    for suspected disability in the category of other health impairment, which includes

8    attention deficit problems, WAC 392-172A-01035(j)(i), or evidence before the ALJ

9    establishing that C.M.'s progress on her name-writing was outside typical educational

10   performance or should have caused the District to suspect C.M.'s hyperkinesis adversely

11   impacted her educational performance. Therefore, Smith fails to establish by a

12   preponderance of the evidence that the District's evaluation was inadequate as to C.M.'s

13   hyperkinesis.

14          Regarding C.M.'s communication and fine motor skills, the ALJ correctly

15   identified WAC 392-172A-01035(1)(d)'s requirement that a student receive speech and

16   language and occupational therapy services as related services or SDI "if the student

17   requires those therapies as specially designed instruction and meets the eligibility

18   requirements which include a disability, adverse educational impact, and need for [SDI]."

19   AR 249. Because C.M. was screened for communication and fine motor issues and no

20   adverse educational impact was identified, the Court finds no reason to reverse the ALJ's

21   conclusion that the reevaluation appropriately addressed Smith's concerns in

22   communication and fine motor skills. AR 253; *L.C. on behalf of A.S.*, 2019 WL 2023567,

1    at *18 (reevaluation requires District to consider existing evaluation data and, considering

2    parental input, decide whether additional data is necessary to ensure FAPE).

3        Regarding sensory issues and anxiety, Smith argues that C.M.'s sensory

4    processing disorder caused her to believe Watson was yelling at her and caused C.M.

5    anxiety resulting in C.M. chewing on her glasses. Dkt. 34 at 5. The District occupational

6    therapist also assessed C.M. for sensory issues in November 2018, using a standardized

7    sensory processing questionnaire completed by Watson. AR 379. The occupational

8    therapist stated that the questionnaire provides "a comprehensive measure of a child's

9    functioning with respect to sensory processing abilities and to identify sensory processing

10    difficulties" and differentiate "between sensory, behavioral or other student components."

11    AR 379. The occupational therapist found no results outside the typical range, AR 379,

12    and found comprehensive evaluation was unnecessary, AR 381. Kurbegovic testified that

13    the team was aware of the outside diagnosis of sensory processing disorders but agreed

14    with the occupational therapist's conclusions. AR 93. Christensen testified that C.M.

15    would talk to Watson about not yelling, but Watson was not in fact yelling and was using

16    a normal tone of voice. AR 38. Chirstensen also testified that she has seen C.M. use her

17    noise cancelling headphones but that C.M. "would often take those off," AR 38–39.

18    Watson testified that C.M. used her sound filtering headphones on the bus but had not

19    required them or her other IEP accommodations in the classroom. AR 142–43. The

20    January 14, 2019 Prior Written Notice stated that C.M. "ha[d] not been observed

21    exhibiting anxious behaviors in the classroom such as chewing her glasses." AR 381.

22

1     Smith submitted evidence at the hearing including photos of C.M.'s glasses with

2  chewed ends, AR 605–05, a December 28, 2018 letter from Smith to the District

3  describing concerns including that C.M. stated she chewed on her glasses because she

4  was scared Watson would yell at her, AR 516, and C.M.'s physician, Dr. Tompkins's

5  evaluation of C.M. on March 9, 2018 through the Pediatric Evaluation of Disability

6  Inventory, finding that C.M. experienced "significant sensory issues" and his December

7  18, 2018 chart note that he believed C.M. suffered from sensory and anxiety issues that

8  impacted her ability to learn. AR 253. She also submitted Beggs's declaration, which

9  states that he observed C.M. discussing her glasses and chewing on them at the same time

10  she complained about Watson shouting at her, and states that C.M. displayed a number of

11  concerning behaviors at home including crying, crawling and hiding, moodiness and

12  hyperactivity "in apparent response to various incidents after her day at school." AR 601–

13  02. Smith argues that Tompkins was an available rebuttal witness at the hearing, but "no

14  one called him as a witness." Dkt. 34 at 11.

15     The ALJ concluded that the occupational therapy assessment appropriately

16  addressed Smith's concerns and found that Tompkins's assessment and notes do not

17  indicate how C.M.'s anxiety and sensory function impact her ability to learn or

18  recommend specific educational services. AR 253. The ALJ also noted that Tompkins's

19  chart notes were hearsay and that Smith consulted with Tompkins after the reevaluation

20  but offered no evidence that Tompkins disagreed with the reevaluation results. AR 254.

21  The ALJ found that "it cannot be concluded that the Reevaluation was inappropriate

22  simply because the results of the BASC-3 assessment and occupational therapy

1    screenings are inconsistent with Dr. Tompkins's chart notes." AR 254. Considering all of

2    the evidence in the record before the ALJ, as well as the fact that Smith's counsel had the

3    opportunity to call Tompkins to testify as to what the District should have done and did

4    not, the Court finds that Smith has not met her burden to show by a preponderance of the

5    evidence that the ALJ wrongly concluded the District's assessment of C.M.'s sensory and

6    anxiety issues was adequate.

7            Regarding toileting issues, Smith emphasizes that C.M. needs to wear Pull-Ups

8    due to behavioral problems, Dkt. 34 at 5, and testified at the hearing that C.M. needed to

9    have her water bottle to drink water during the day due to her constipation, AR 196–97.

10   The ALJ made a factual finding that, despite deciding to cease special education services,

11   the District would continue to allow C.M unrestricted access to the bathroom, her water

12   bottle, the class water fountain, and Dixie cups. AR 246. The ALJ considered Watson's

13   testimony that C.M. would have these accommodations per her medical file, AR 128,

14   Van Cleeve's testimony that C.M. was being denied these accommodations, AR 148–49,

15   and the attorney for the District's representation that exiting C.M. from special education

16   had no impact on medical accommodations that were not part of the IEP, AR 193. Smith

17   does not point to additional evidence before the ALJ that should have been considered.

18   Affording some weight to the ALJ's assessment of the testimony, the Court concludes

19   that Smith has failed to establish by a preponderance of the evidence that the District's

20   assessment was inappropriate as to C.M.'s toileting issues.

21

22

#### d.      Notice of Right to IEE

Smith argues the District failed to comply with its obligation to inform her of her right to an IEE. Dkt. 1-1 at 9 (citing 34 C.F.R. § 300.502(a)(2); WAC 392-172A-05005). The January 14, 2019 Prior Written Notice explained when a copy of the Notice of Procedural Safeguards for Special Education Students and Their Families would be provided and explained that Smith could contact Kurbegovic if a copy was not enclosed and she would like to request a copy. AR 452. The Court identifies no basis to disagree with the ALJ's conclusion that WAC 392-172A-05005(1)(b) provides that a public agency must provide information about IEEs upon request, not that they have an obligation to provide information in absence of a request in all circumstances. AR 251; *accord* 34 C.F.R. § 300.502(a)(2). State regulations also provide that school districts must give a procedural safeguards notice to parents once per year as well as in specified circumstances and must post the notice on their websites. WAC 392-172A-5015. Moreover, as the ALJ noted, Smith timely requested an IEE. AR 252. Therefore, any failure on the District's part was harmless. *Timothy O.*, 822 F.3d at 1118.

#### e.      School Nurse Presence

Smith argued before the ALJ and argues again before the Court that because the school nurse did not attend the January 8, 2019 meeting to discuss C.M.'s reevaluation for services, the reevaluation was inappropriate. AR 250.

The ALJ found that the District complied with the regulation relevant to conducting a reevaluation, WAC 392-172A-3020, which requires that the District convene a "group of qualified professionals" to conduct an evaluation. AR 250. The ALJ

1    explained that, while the reevaluation team was thus not required to include a nurse or

2    other medical professional, Rychtarik was a member of the District's team and

3    contributed though she did not attend the meeting. *Id.* The ALJ also cited WAC 392-

4    172A-03025's requirement that a reevaluation team review medical/physical data to

5    determine whether the student suffers from a condition which impacts educational

6    performance. *Id.* at 250–51. The ALJ concluded that because WAC 392-172A-3020

7    requires the reevaluation team to consider information provided by the parent and WAC

8    392-172A-03025 requires a review of medical/physical information, "the information

9    should be reviewed by the school nurse and the Parent should have the opportunity to

10   discuss the information with the reevaluation team as part of the reevaluation process."

11   *Id.*

12           Smith now cites 20 U.S.C. § 1414(d)(1)(C), which provides that IEP team member

13   attendance is required at IEP meetings and may only be excused "if the parent of a child

14   with a disability and the local educational agency agree that the attendance of such

15   member is not necessary because the member's area of the curriculum or related services

16   is not being modified or discussed in the meeting." Dkt. 1-1 at 8[4]; *accord* WAC 392-

17   172A-3095(5)(a). She alleges that the District thus had an obligation to inform her that

18   Wiseman would replace Rychtarik as a member of the IEP team for the Evaluation

19   Summary meeting on January 8, 2019 and alleges that this was important because

20   Rychtarik had possession of C.M.'s outside medical records. Dkt. 1-1 at 8. She also

21   _____

22           [4] While Smith cites section 614(d)(1)(C), the Court understand this to be a typographical
     error as the language she quotes appears in section 1414(d)(1)(C).

1    argues that because she requested reevaluation, a nurse's attendance at the January 8,

2    2019 meeting was required. Dkt. 34 at 5.

3         It is undisputed that Rychtarik was originally listed as the school nurse member of

4    the reevaluation team, AR 362, but was replaced by another school nurse, Sarah

5    Wiseman, AR 366, and neither nurse attended the January 8, 2019 reevaluation meeting.

6    The District does not specifically address whether a school nurse becomes a member of

7    the IEP team subject to the excusal requirement by virtue of being invited to a meeting to

8    consider reevaluation. It emphasizes that the ALJ correctly concluded that the District

9    met its obligation for the evaluation review meeting to include qualified professionals.

10   Dkt. 32 at 23 (citing AR 250).

11        The Court concludes that the ALJ correctly decided the issue of the school nurse's

12   attendance based at least on the ALJ's conclusion about the impact of the attendance on

13   the evaluation and likely based on the regulatory scheme as well.

14        Regarding the regulatory scheme, WAC 392-172A-03025 refers to "the IEP team

15   *and other qualified professionals*," (emphasis added), and WAC 392-172A-03030(1)

16   provides that evaluations before a change in eligibility must comply with WAC-392-

17   172A-0320 through WAC 392-172A-0380. This range does not include WAC 392-172A-

18   3095(5)(a), the IEP team attendance requirement. Consistent with this interpretation, the

19   record shows the reevaluation team contained additional members beyond the IEP team,

20   suggesting the two are separate. *Compare* AR 347, 350 (listing attendees at IEP review

21   meeting) *with* AR 362 (listing larger group of participants invited to the reevaluation

22

1    meeting). Therefore, it appears to the Court that the District was not required to comply

2    with WAC 392-172A-3095(5)(a)'s procedures regarding the school nurse's attendance.

3          Regarding the impact of the nurse's absence, Smith argues that Kurbegovic "could

4    not possibly interpret all of the medical, therapist, and counseling records that [Smith]

5    submitted to [Rychtarik]" and argues that if a school nurse had been present at the

6    January 8, 2019 meeting, the team would have concluded C.M. needed continued special

7    education services. Dkt. 34 at 5, 10. Smith also alleges that the ALJ failed to account for

8    Van Cleeve's testimony on this issue, Dkt. 1-1 at 4, which was that at the November 27,

9    2018 meeting the team told Smith the medical records were not important and were not

10   needed. AR 150. Additionally, Smith testified that she shared her concerns about C.M. at

11   the January 8, 2019 meeting and the team listened, but after Kurbegovic explained that

12   she had discussed the medical records with the nurse the team declined to discuss the

13   medical records further because the records were not present. AR 229–230.

14         While the ALJ did not note Van Cleeve or Smith's testimony, the ALJ concluded

15   that the Evaluation Summary and Kurbegovic's testimony establish that that Rychtarik

16   prepared the Evaluation Summary's discussion of C.M.'s medical conditions, noted that

17   Rychtarik's summary does not find that the medical information suggested barriers to

18   C.M.'s ability to learn, and found that Kurbegovic discussed C.M.'s medical information

19   with Rychtarik prior to the January 8, 2019 meeting, and the team discussed C.M.'s

20   medical conditions during the reevaluation process. AR 244, 251. The ALJ also found

21   that Watson and Christensen credibly testified that C.M.'s medical needs "are addressed

22

1   by a health plan that includes making water available, unrestricted access to the restroom,

2   and sound filtering headphones." AR 251.

3       The District points out that Christensen testified the IEP team discussed the

4   medical records at length, AR 53, Watson testified that at every meeting with Smith,

5   Smith discussed C.M.'s medical concerns and medical records, AR 129, and Kurbegovic

6   testified that the District contacted C.M.'s medical providers to ensure it had thorough

7   medical records, AR 70, and that the team discussed the outside medical information, AR

8   80. The District also points out that Christensen testified that she finds that C.M. does not

9   exhibit signs of anxiety, stress or fearfulness, AR 38–39, and that Watson testified that

10  she had never observed C.M. showing anxiety, fearfulness, stress, or sensitivity to loud

11  noises. AR 109, 112–13.

12      Though a more thorough decision would have accounted for how Van Cleeve and

13  Smith's testimony conflicts with the District employees' testimony, the ALJ heard all of

14  this evidence and her conclusion has sufficient support in the record. *J.W.*, 626 F.3d at

15  438 (de novo review of ALJ decision is inappropriate). The preponderance of the

16  evidence supports the ALJ's conclusion that the reevaluation team "considered and

17  discussed all the medical information" Smith provided and the evaluation appropriately

18  concluded C.M.'s conditions did not impact her ability to learn in the general education

19  environment. AR 251; *see L.J. by and through Hudson*, 850 F.3d at 1003; *Timothy O.*,

20  822 F.3d at 1118 (parent has right to meaningful participation and consideration of

21  evidence presented). Even if the Court's analysis of the regulatory scheme is incorrect,

22  considering all of the evidence and affording some weight to the ALJ's view of the

1   testimony, Smith does not meet her burden to show by a preponderance of the evidence

2   that that the nurse's attendance would have given her a substantially different opportunity

3   to raise her concerns or would have presented information that was irreconcilable with

4   the evaluation team's conclusions.

5               **f.      Watson's Qualifications**

6          Smith's pleadings raise a number of concerns about Watson's qualifications,

7   including that Watson "was teaching under a conditional certificate," "was not qualified

8   to teach Peer Inclusion Developmental Preschool" and "did not understand C.M.'s

9   disabilities." Dkt. 34 at 3 (citing AR 597–99). She argues the ALJ erred in finding

10  Watson was certified to teach in Washington. Dkt. 34 at 6 (citing AR 242).

11         Regarding Smith's apparent argument that Watson's participation in the

12  evaluation was inappropriate, under WAC 392-172A-0320(3), "[a]ssessments and other

13  evaluation materials used to assess a student" must be "administered by trained and

14  knowledgeable personnel." Participants in a reevaluation include "the IEP team and other

15  qualified professionals, as appropriate."  WAC 392-172A-03025. IEP team membership

16  must include "[n]ot less than one special education teacher of the student, or where

17  appropriate, not less than one special education provider of the student." WAC 392-

18  172A-3095.

19         Smith is correct that the District's April 18, 2019 response to her record request

20  states that Watson had not met the Washington teacher certification requirements for the

21  grade level and subject areas in which the teacher provides instruction and was teaching

22  under a conditional certificate. AR 599. Watson testified before the ALJ on May 1, 2019

1    that she was "now" certified to teach in Washington as her certificate had been

2    transferred from California. AR 106. She also testified that she was obtaining a Master's

3    degree in special education and had worked in education in California and Texas for

4    fifteen years prior to being hired in Washington in August 2018. AR 106–07. The District

5    argues that Kurbegovic is the relevant "trained and knowledgeable" staff member who

6    administered the BASC-3 evaluation and that to the extent Smith argues Watson was not

7    qualified to be an evaluation team member, the argument fails on Watson's testimony

8    about her qualifications. Dkt. 32 at 24 (citing AR 106).

9        The ALJ found that Watson was certified to teach in Washington and did not

10   address Smith's evidence that suggests Watson was teaching under a conditional

11   certificate at the time of the evaluation. AR 242 n.5. Kurbegovic compared ratings

12   provided by Smith, Watson, and Sabol (C.M.'s previous teacher). AR 376. There is no

13   authority or evidence in the record that BASC-3 ratings must be conducted by a certified

14   teacher, and even if Watson may have lacked certification at the time she conducted the

15   evaluation, transfer of her certificate from California would not have changed her training

16   enabling her to complete the ratings. Moreover, the ALJ accurately determined that

17   Watson and Sabol's ratings on the BASC-3 were generally consistent with the exception

18   of Sabol's moderate concern in the area of somatization, or sensitivity to physical pain

19   (based on missing school due to physical problems). AR 245; *see also* AR 376. This

20   consistency suggests Watson's ratings did not skew the evaluation's conclusion. The

21   Court thus finds the ALJ's conclusion that the BASC-3 was properly conducted is

22   supported by a preponderance of the evidence. AR 245, 252. To the extent Smith intends

1    to argue that other information Watson provided is suspect due to her lack of

2    certification, the Court again finds no evidence that transfer of Watson's certificate from

3    California would alter her training enabling her to complete the ratings. Finally, to the

4    extent Smith argues that C.M.'s placement in Watson's classroom was inappropriate, this

5    claim is unexhausted.

6                    **g.      Alleged Manipulation of Documents**

7            Smith alleges that the District "[f]ail[ed] to acknowledge that [Kurbegovic]

8    committed forgery and fraud through a prior Written Notice dated 1/14/19," alleging that

9    "[i]nstead of having another meeting with the IEP team, per Principal Rebecca Owens, to

10   review the changes and obtain new signatures, she took it upon herself to use the

11   signatures from the 1/8/19 Evaluation Summary Meeting to exit [C.M.] off her IEP in

12   1/14/19 Prior Written Notice." Dkt. 1-1 at 9. Smith further alleges that her October 25,

13   2018 request for reevaluation is missing from the record because the District failed to

14   upload it to the relevant public records file and that Kurbegovic "did not have [Smith's]

15   permission to use [Smith's] signature and date from 1/8/19 on an Evaluation Summary

16   that she made changes to after 1/8/19." *Id.* at 7, 9. Similarly, Smith argues that

17   Kurbegovic manipulated the November 30, 2018 Notice of Meeting "by copying and

18   pasting a paragraph written by [Smith] onto the bottom of the document" and then

19   refused to upload the document to the District's Public Records Department. Dkt. 34 at 2.

20   The District argues that to the extent Smith alleges claims for forgery or fraud, these

21   claims should be dismissed. Dkt. 32 at 30.

22

1    The Court does not understand Smith to state an independent tort claim; rather it

2    appears that she argues these alleged irregularities are reasons the ALJ should have found

3    the District's evaluation process was incomplete or otherwise improper. Either way, the

4    Court agrees with the District that these allegations do not support a basis for reversing

5    the ALJ's decision or for other relief. Smith does not specify the changes she alleges

6    Kurbegovic made to the documents or show evidence that these changes interfered with

7    her rights under the IDEA beyond her arguments (previously discussed) that the District

8    misrepresented who requested reevaluation of C.M. and improperly substituted one

9    school nurse for another on the reevaluation team. Regarding claims related to

10   reevaluation and to the school nurse, the Court has already concluded that Smith fails to

11   establish a procedural violation causing harm.

12       Regarding the unspecified revision Kurbegovic allegedly made to the Evaluation

13   Summary, Dkt. 1-1 at 9, Kurbegovic testified that following the meeting, Smith asked her

14   to include some additional information to ensure accuracy, so she did. AR 72. The Court

15   reviewed Smith's Exhibit 6 before the ALJ, which contains the January 14, 2019 Prior

16   Written Notice followed by the January 8, 2019 Evaluation Summary. AR 451–64.

17   Smith's handwritten note on the Evaluation Summary's signature page states "[s]ignature

18   page from 1/8/1[9] Re-Evaluation Meeting." AR 456. The last page of the exhibit

19   contains another handwritten note stating that the documents were "[s]ent home in

20   [C.M.'s] backpack 1/14/19 using my signature from 1/8/19 to approve exit off of IEP

21   with new changes." AR 464. However, the Prior Written Notice clearly states that though

22   Smith signed the attached Evaluation Summary, she "confirmed via email that she does

1   not agree with the team's decision and is requesting an independent educational

2   evaluation (IEE)." AR 451. The Court is thus unable to identify how Smith was

3   prejudiced based on an alleged change to the Evaluation Summary or based on the

4   alleged use of her signature and thus finds no basis to reverse the ALJ's decision. *C.f.*

5   *M.C. by and through M.N.*, 858 F.3d at 1195–98 (finding procedural violation of IDEA

6   and prejudice to plaintiff when district unilaterally changed offer of services in IEP,

7   depriving plaintiff of ability to effectively monitor and enforce IEP and causing her to

8   incur legal fees to protect educational rights).

9         In sum, while the Court respects Smith's dedication to her granddaughter's

10   education, the Court does not find a basis to conclude that the ALJ's decision that the

11   District's reevaluation was appropriate should be reversed.

12   **B.   Smith's Additional Claims**

13         **1.   Summary Judgement Standard**

14         Summary judgment is proper only if the pleadings, the discovery and disclosure

15   materials on file, and any affidavits show that there is no genuine issue as to any material

16   fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

17   The moving party is entitled to judgment as a matter of law when the nonmoving party

18   fails to make a sufficient showing on an essential element of a claim in the case on which

19   the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

20   (1986). There is no genuine issue of fact for trial where the record, taken as a whole,

21   could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

22   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

1    present specific, significant probative evidence, not simply "some metaphysical doubt").

2    *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if

3    there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

4    jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477

5    U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

6    626, 630 (9th Cir. 1987).

7        The determination of the existence of a material fact is often a close question. The

8    Court must consider the substantive evidentiary burden that the nonmoving party must

9    meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

10   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

11   issues of controversy in favor of the nonmoving party only when the facts specifically

12   attested by that party contradict facts specifically attested by the moving party. The

13   nonmoving party may not merely state that it will discredit the moving party's evidence

14   at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

15   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

16   nonspecific statements in affidavits are not sufficient, and missing facts will not be

17   presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

18       **2.    Analysis**

19       The District also seeks summary judgment on Smith's claims for violation of

20   HIPAA, FERPA, and 18 U.S.C. § 1505, arguing that none of these statutes afford a

21   private right of action. Dkt. 32 at 7. As set out below, the District is correct. In the event a

22   court finds dismissal is warranted, it should grant leave to amend unless amendment

would be futile. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Amendment is futile where no private right of action is available, so the Court does not grant leave to amend.

### a.    HIPAA

Smith alleges that the District violated HIPAA by sharing C.M.'s medical records with Wiseman, who had not signed the relevant medical records release. Dkt. 1-1 at 4. HIPAA was intended "'to recogniz[e] the importance of protecting the privacy of health information in the midst of the rapid evolution of health information systems.'" *Webb v. Smart Document Solutions, LLC*, 499 F.3d 1078, 1084 (9th Cir. 2007) (quoting *S.C. Med Ass'n v. Thompson*, 327 F.3d 346, 348 (4th Cir. 2003)). However, the Ninth Circuit holds that HIPAA lacks a private right of action, meaning that an individual litigant like Smith may not sue based on an alleged violation. *Id*. at 1082 (citing 65 Fed. Reg. 82601 (Dec. 28, 2000) ("Under HIPAA, individuals do not have a right to court action.")). Therefore, the Court grants summary judgment for the District on this claim.

### b.    FERPA

Smith alleges that the District violated FERPA by failing to include the October 25, 2018 Request for Re-Evaluation she signed and the November 30, 2018 Notice of Meeting in C.M.'s "District Public Records." Dkt. 1-1 at 7. "Congress enacted FERPA under its spending power to condition the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 279 (2002) ("*Gonzaga*"). In *Gonzaga*, the Supreme Court held that FERPA's nondisclosure provisions do not confer enforceable rights. *Id*. at 277

(construing 20 U.S.C. § 1232g(b)). Smith's claim would fall under 20 U.S.C. § 1232g(a), pertaining to parental right to access student files. Multiple circuits "have stated in dicta and without discussion that *Gonzaga* applies to FERPA broadly, rather than only to the non-disclosure provisions of § 1232g(b)." *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 783 (2nd Cir. 2002) (citing *Mo. Child Care Ass'n v. Cross*, 294 F.3d 1034, 1040 n.8 (8th Cir. 2002)); *United States v. Miami Univ.*, 294 F.3d 797, 809 n.11 (6th Cir. 2002)); *see also Henry v. Universal Tech. Inst.*, 559 F. App'x 648, 651 (9th Cir. 2014) (FERPA "does not provide for a private right of action."). Construing FERPA's access provisions under the analytical framework in *Gonzaga*, the Second Circuit held that no private right of action is available under § 1232g(a). *Taylor*, 313 F.3d at 783–86. Finding no authority to the contrary, the Court agrees with the Second Circuit and concludes that Smith has no private right of action to remedy an alleged FERPA violation. Therefore, the Court grants summary judgment for the District on this claim.

### c.    18 U.S.C. § 1505

Smith alleges that the District withheld legal evidence "from Tacoma School District Public Records, District and Agency." Dkt. 1-1 at 7. Similar to her FERPA claim, she alleges that the Request for Re-Evaluation she signed on October 25, 2018 and the Notice of Meeting dated November 30, 2018 "were never uploaded to Tacoma School District Public Records . . . which is why District never entered them as exhibits." *Id.* Under 18 U.S.C. § 1505, it is a federal crime to "corruptly, or by threats of force, or by any threatening letter or communication," obstruct or impede proceedings "before any department or agency of the United States." This criminal statute does not provide a

1   private cause of action or basis for a civil lawsuit. *See, e.g.*, *Gage v. Wells Fargo Bank,*

2   *N.A., AS*, 555 F. App'x 148, 151 (3d Cir. 2014) (citing *Gonzaga*, 536 U.S. at 283–84) (18

3   U.S.C. § 1505 is a criminal statute which does not unambiguously convey a private right

4   of action); *Hamilton v. Reed*, 29 F. App'x 202, 204 (6th Cir. 2002) (no private right of

5   action for alleged violation of 18 U.S.C. § 1505). Therefore, the Court grants summary

6   judgment for the District on this claim as well.

7   **C.    Additional Motions**

8        Smith seeks to submit the May 14, 2019 decision of the Social Security

9   Administration ("SSA") finding C.M. eligible for supplemental security income. Dkt. 37.

10   The District is correct that its actions should be judged in light of the information

11   available at the time "and not from the perspective of a later time with the benefit of

12   hindsight." Dkt. 39 at 4 (quoting *L.J. by and through Hudson*, 850 F.3d at 1004). The

13   District is also correct that the SSA decision does not comment on C.M.'s educational

14   performance or functioning. *Id*.; *see also* WAC 392-172A-01035(1)(a) (student with

15   qualifying disability is eligible for special education when their needs cannot be

16   addressed through general education with or without individual accommodations). The

17   Court finds that Smith has not met her burden to show the additional information is

18   necessary or relevant to the issue of review of the ALJ's decision before the Court and

19   denies the motion. *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin.*

20   *Hearings*, 652 F.3d 999, 1005 (9th Cir. 2011) (additional evidence must be non-

21   cumulative and relevant).

22

1    Smith also moves to compel interrogatories and requests for production. Dkt. 40.

2    The Court previously denied a similar motion to compel for failure to certify any attempt

3    to meet and confer pursuant to Fed. R. Civ. P. 37(a)(1) and failure to establish that the

4    discovery sought was necessary in light of the administrative record or otherwise

5    relevant. Dkt. 35 (citing *Ojai*, 4 F.3d at 1473; *E.M. ex rel. E.M.*, 652 F.3d at 1005).

6    Though this second motion provides an exhibit showing Smith's written correspondence

7    with the District regarding the discovery, Dkt. 40-1, the motion again does not include a

8    certification that she met with the District to try to resolve the dispute without Court

9    intervention as Fed. R. Civ. P. 37(a)(1) requires or establish that the discovery sought is

10   necessary or relevant in light of the administrative record, so the Court denies the motion

11   for the same reasons. In addition, the motion was filed on June 16, 2020, well outside the

12   April 20, 2020 deadline for close of discovery in this case. Dkts. 26, 40.

13                                  **V.   ORDER**

14       Therefore, it is hereby **ORDERED** that the District's motion for summary

15   judgment, Dkt. 32, is **GRANTED** and Smith's motion to submit SSA Decision and

16   motion to compel interrogatories and requests for production are **DENIED**, Dkts. 37, 40.

17       The Clerk shall enter a JUDGMENT and close the case.

18       Dated this 3rd day of August, 2020.

19

20

21   BENJAMIN H. SETTLE
     United States District Judge

22

ORDER - 43